UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BAUSCH & LOMB INCORPORATED,

                              Plaintiff,

v.                                                         Case # 14-CV-6640-FPG

                                                           DECISION & ORDER

MIMETOGEN PHARMACEUTICALS, INC.,

                              Defendant.

MIMOTEGEN PHARMACEUTICALS, INC.,

                              Counterclaim Plaintiff and
                              Third-Party Plaintiff,

v.

BAUSCH & LOMB INCORPORATED,

                              Counterclaim Defendant,

and

VALEANT PHARMACEUTICALS
INTERNATIONAL, INC.,

                              Third-Party Defendant.

## INTRODUCTION

This case involves a contract between Mimetogen Pharmaceuticals, Inc. ("MPI") and Bausch & Lomb Incorporated ("B+L") regarding the development, licensing, and potential commercialization of "MIM-D3," an ophthalmic solution created by MPI for the treatment of dry eye syndrome.

B+L initiated this action by seeking a declaratory judgment that B+L is not obligated to make any further payments to MPI under the contract.  ECF No. 1.  MPI, in turn, asserted various counterclaims against B+L and third-party defendant Valeant Pharmaceuticals International, Inc. ("Valeant").  ECF No. 6.

Presently before the Court is a motion to dismiss filed by B+L and Valeant, in which B+L and Valeant argue that some of MPI's counterclaims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF No. 17.  For the reasons stated below, that motion is granted in part and denied in part.

## BACKGROUND

MPI is a privately-held biotechnology company incorporated in Quebec, Canada with its principal place of business in Montreal, Quebec.  ECF No. 6, at 7 ¶16.  B+L is a New York corporation with its principal place of business in Bridgewater, New Jersey.  *Id.* at 7 ¶18.  Valeant, which acquired B+L on August 5, 2013, is a Canadian corporation with its principal place of business in Laval, Quebec.  *Id.* at 7 ¶18-19.  B+L continues to operate as a wholly-owned subsidiary of Valeant.  *Id.* at 7 ¶19.

## 1.  The Agreement

On July 17, 2013, MPI and B+L entered into a Development Collaboration and Exclusive Option Agreement (the "Agreement") regarding "MIM-D3," an ophthalmic solution created by MPI to treat dry eye syndrome.  *Id.* at 4 ¶1.  Under the Agreement, MPI granted B+L an option (the "Option") to obtain an exclusive, worldwide license to develop and commercialize products using MIM-D3.  *Id.* at 8 ¶23, 25; ECF No. 23-3, Ex. 2 ("Agreement"), § 5.1.

The Agreement also provided for MPI to conduct an initial clinical trial, referred to in the Agreement as the "Initial Phase III Trial," in order to gather information about the safety and effectiveness of MIM-D3.  Agreement § 2.  B+L's rights and obligations with respect to

2

exercising the Option, as well as the price of exercising the Option, hinged on the outcome of the Initial Phase III Trial.

Under § 5.4 of the Agreement, if the Initial Phase III Trial was "Completely Successful" or "Successful," B+L was obligated to exercise the Option at the price given in either § 5.5(a) or § 5.5(b).

If the Initial Phase III Trial was "Partially Successful," "Inconclusive," or "Not Successful," § 5.5(c) of the Agreement provided that B+L could either exercise the Option, extend the Option to conduct an additional trial, or decide to not exercise the Option. According to MPI, the Agreement contemplated the possibility of additional trials because "[i]n light of the prior results of other clinical trials for dry eye syndrome, the parties recognized that Additional Trials would most likely be necessary." ECF No. 6, at 9 ¶27. In addition, MPI alleges that "[i]t was contemplated by the parties that MPI would suffer damages in the form of loss of some or all of the value of its enterprise if B+L walked away from the Agreement after release of the Initial Phase III Trial results." *Id.* at 11 ¶39.

As a result of these considerations, the Agreement gave B+L a disincentive to walk away after the Initial Phase III trial. Specifically, if the Initial Phase III Trial was Partially Successful or Inconclusive, and B+L declined to either exercise or extend the Option, B+L was obligated to pay MPI a fee of $20 million. Agreement § 5.5(c). According to MPI, this payment "was understood by the parties to be made to, among other things, assist in the funding of the next clinical trial and allow MPI to continue the development of MIM-D3 without delay or interruption." ECF No. 6, at 11 ¶38. However, if the Initial Phase III Trial was Not Successful, B+L could decide to not exercise the Option without making any further payments to MPI. Agreement § 5.5(c).

## 2. Valeant's Acquisition of B+L

On May 27, 2013, Valeant announced that it was acquiring B+L in a transaction valued at $8.7 billion. ECF No. 6, at 17 ¶72. On the day the acquisition was announced, B+L sent an e-mail to MPI assuring MPI that it remained committed to closing the Agreement with MPI. *Id.* According to MPI, "B+L was compelled to provide this type of assurance to MPI due to Valeant's industry reputation as a serial acquirer of other pharmaceutical companies and its preferred business strategy of aggressively slashing research and development costs at its acquired companies." *Id.* at 17 ¶73. Valeant completed its acquisition of B+L on August 5, 2013, after the Agreement between MPI and B+L was entered into. *Id.* at 17 ¶74.

## 3. The Initial Phase III Trial

On October 10, 2013, MPI announced that it had enrolled patients in the Initial Phase III Trial. ECF No. 6, at 12 ¶41. The Initial Phase III Trial, which lasted 8 weeks and included 403 patients, was conducted in large part in Massachusetts. *Id.* at 12 ¶42, 13 ¶47.

Patients in the Initial Phase III Trial were divided into two groups: the active drug group and the placebo group. *Id.* at 12 ¶43. The active drug group received an ophthalmic solution containing MIM-D3, and the placebo group received only a placebo. *Id.* Both groups were placed in a Controlled Adverse Environment chamber ("CAE chamber"), which subjected the participants' eyes to a stressful, drying environment. *Id.* The effectiveness of MIM-D3 was measured by comparing the active drug group to the placebo group with respect to how exposure to the CAE chamber affected participants' signs and symptoms.[1] *Id.* at 12 ¶44-45.

## 4. Valeant's Attempted Acquisition of Allergan

On April 22, 2014, Valeant announced that it was submitting a proposal to acquire Allergan, another pharmaceutical company that makes eye care products. *Id.* at 18 ¶75.

---

[1] The term "sign" refers to an objective measurement, while the term "symptom" refers to a subjective measurement. ECF No. 23, at 2 n.1.

Allergan is the maker of Restasis, the only FDA-approved drug to treat chronic dry eye syndrome. *Id.* According to MPI, "B+L's attitude toward its partnership with MPI and interpretation of the Initial Phase III Trial results began to shift in a negative manner after Valeant announced its pursuit of Allergan, MPI's competitor." *Id.* at 19 ¶82.

On July 31, 2014, as part of its bid to acquire Allergan, Valeant issued a presentation regarding its financial results where Valeant showed itself on a stand-alone basis and on a combined basis with Allergan based on Allergan's financial projections. *Id.* at 18 ¶78. MPI was not mentioned in the presentation, even though Valeant had used MPI in earlier presentations in order to respond to Allergan's criticisms regarding Valeant's reputation for slashing research and development. *Id.* at 18 ¶79.

Ultimately, Valeant's pursuit of Allergan was unsuccessful. Allergan entered into an alternative transaction to sell itself to Actavis plc, which was announced on November 17, 2014. *Id.* at 19 ¶81.

### 5. Results of the Initial Phase III Trial

During an April 25, 2014 conversation between representatives of MPI and B+L, B+L's representative declined the opportunity to receive an early look at the results of the data generated during the Initial Phase III Trial. *Id.* at 13 ¶48. The B+L representative's explanation was that reviewing the trial results early would force B+L to meet with Valeant executive management earlier than scheduled in order to discuss how B+L should proceed under the Agreement. *Id.*

MPI eventually did provide B+L with the results of the Initial Phase III Trial on May 12, 2014. *Id.* The parties agree that the Initial Phase III Trial was not Completely Successful, Successful, or Partially Successful as those terms are defined in the Agreement. Therefore, B+L's rights and obligations under the Agreement were to be determined based on whether the

Initial Phase III Trial was Inconclusive or Not Successful.  The term "Inconclusive" is defined in §1.25 of the Agreement to mean results that are "not Completely Successful, Successful, Partially Successful, or Not Successful."  The term "Not Successful" is defined in § 1.41 of the Agreement:

> "Not Successful" means (a) the FDA determines, after a formal meeting and per its formal meeting minutes, that there are Significant Safety Issues, or (b) the results of the Initial Phase III Trial or any Additional Trial indicate that the efficacy of the Licensed Product on both primary sign and symptom endpoints at the primary time point (Day 29 for the Initial Phase III Trial), as defined in the Protocol, are not statistically significantly superior to the vehicle with a p value of 0.050 or less, and the FDA does not agree that either a sign or symptom, that were assessed in the Initial Phase III Trial or the Additional Trial, can be used as the primary sign or symptom to support the Approval of the Licensed Product.

According to MPI, "members of B+L's team were enthusiastic about the results of the Initial Phase III Trial during the late May/early June 2014 timeframe.  In early June 2014, the head of product manufacturing for B+L traveled to Germany to perform an audit of the manufacturing process for new batches of MIM-D3 to be used in Additional Trials."  *Id.* at 13 ¶49.

On July 15, 2014, representatives from MPI and B+L met with FDA officials to review the Initial Phase III results.  ECF No. 6, at 14 ¶52.  The meeting took place at the FDA's office in Silver Spring, Maryland.  ECF No. 23-2, Ex. 1 ("FDA Meeting Minutes"), at 1.

Prior to the meeting, MPI sent questions to the FDA regarding MIM-D3 and the Initial Phase III Trial.  FDA Meeting Minutes, at 2.  According to MPI, "B+L was fully aware that the questions drafted and submitted to the FDA were directed to the approval of the exploratory endpoints that had been assessed in the Initial Phase III Trial, because those endpoints had generated positive indications during the trial."  ECF No. 6, at 15 ¶57.  B+L had been provided with the list of proposed questions to the FDA in advance of the meeting and was allowed to

comment on and participate in the preparation of those questions.  *Id.* at 15 ¶56.  At the meeting, the parties discussed the FDA's responses to those questions.  FDA Meeting Minutes, at 2.

On July 30, 2014, the FDA circulated the formal "Meeting Minutes" from the July 15, 2014 meeting.  ECF No. 6, at 15 ¶59.  These Meeting Minutes included the questions submitted by MPI, the FDA's responses to those questions, and a summary of any discussion that took place at the meeting regarding those questions.  *See* FDA Meeting Minutes, at 2.  One question MPI posed was: "Does the Agency agree that the assessed endpoints can be used as a primary sign endpoint in support of the approval of the product?"  *Id.*  With respect to the change in participants' "corneal fluorescein staining in the central region" following exposure to the CAE chamber, the FDA responded as follows:

> A change in corneal fluorescein staining in a pre-specified area (e.g., central region) at a pre-specified time following exposure to a dry environment is acceptable as a "sign endpoint" when coupled with a "symptom endpoint" to support the efficacy of a product for the treatment of dry eyes.  The use of proprietary testing procedures may raise questions about the ability to generalize the test results to support a more generalized label.

*Id.*  With respect to the change in participants' corneal fluorescein staining in the total cornea (sum of the inferior, central and superior regions) following exposure to the CAE chamber, the FDA provided an identical response.  *Id.* at 2-3.

Another question posed by MPI was: "Does the Agency agree that the assessed endpoints can be used as a primary symptom endpoint in support of the approval of the product?"  *Id.* at 3. With respect to participants' response to a question about "blurred vision" in the OSDI Questionnaire, the FDA provided the following response:

> It is not recommended.  A change in a patient's response to a question about an ocular symptom at a pre-specified time is acceptable as a "symptom endpoint" when coupled with a "sign endpoint" to support the efficacy of a product for the treatment of dry eyes.  For the purposes of assessing vision, it is generally expected that vision would be measured using a standardized chart.  A single question concerning the quality of an individual's vision may be acceptable as a "symptom endpoint."  We are not aware of validation studies of any single (or

subset) question from the OSDI Questionnaire.  The use of proprietary testing procedures may raise questions about the ability to generalize the test results to support a more generalized label.

*Id.*  The FDA also applied this response to all other symptom endpoints listed by MPI.  *Id.*

The FDA did not express any safety issues regarding MIM-D3, meaning that part (a) of the "Not Successful" definition in § 1.41 of the Agreement does not apply.  *Id.*; ECF No. 6, at 16 ¶68.  MPI's position is that the FDA Meeting Minutes rule out part (b) of the definition as well. ECF No. 6, at 16 ¶69.  In particular, MPI interprets the FDA Meeting Minutes to reflect that "the FDA agreed that both a sign and a symptom assessed in the Initial Phase III Trial can be used as the primary sign or symptom to support the Approval of the Licensed Product."  *Id.* at 16 ¶67. Thus, MPI believes that the Initial Phase III Trial results were Inconclusive.  *Id.* at 17 ¶71.

Further, MPI alleges that "[t]here is no reasonable possibility that B+L and Valeant, with their expansive and sophisticated knowledge of the pharmaceutical industry, clinical trials, and FDA approval processes, do not know for certain that the outcome of the Initial Phase III Trial is not 'Not Successful' pursuant to the carefully crafted language of the Agreement defining that term."  *Id.* at 17 ¶70.

### 6. B+L's Decision to Not Exercise the Option

On August 1, 2014, MPI sent the FDA Meeting Minutes to B+L and informed B+L of MPI's position that the Meeting Minutes demonstrated that the results of the Initial Phase III Trial were Inconclusive.  *Id.* at 19 ¶83.  Under § 5.4 of the Agreement, B+L's receipt of the FDA Meeting Minutes triggered a 30-day deadline for B+L to decide how to proceed with respect to exercising, extending, or deciding not to exercise the Option.

On August 4, 2014, B+L responded with an acknowledgement of receipt of the Meeting Minutes. ECF No. 6, at 19 ¶84.  B+L also stated that it "looked forward to working with MPI to explore the possibility of collaborating with a third party to further develop the Product,"

included a list of proposed third parties for such a collaboration, and "expressed appreciation for MPI's willingness to consider proceeding with Additional Trials with a collaborator." *Id.*

Ultimately, however, B+L allowed the 30-day deadline to come and go without exercising or extending the Option. *Id.* at 20 ¶86. In a September 2, 2014 email, B+L communicated its position that no $20 million payment was due to MPI because the Initial Phase III Trial was Not Successful. *Id.* at 20 ¶87. Attached to the email was a letter dated August 29, 2014 from Ari Kellen ("Kellen"), an Executive Vice President and Company Group Chairman of Valeant. *Id.*

According to MPI, senior B+L employees were reporting directly to J. Michael Pearson ("Pearson"), Valeant's Chief Executive Officer, regarding the Initial Phase III Trial and B+L's actions under the Agreement. *Id.* at 26 ¶119. Valeant allegedly exercised "domination and control of B+L in respect of all facets of the relationship with MPI after Valeant's acquisition of B+L." *Id.* MPI also alleges that Kellen, who reports directly to Pearson, "was personally responsible for terminating the Option." *Id.*

MPI further alleges that B+L and Valeant knowingly and falsely contended that the Initial Phase III Trial was "Not Successful," and that this decision was motivated by the fact that Valeant was in the process of acquiring Allergan. *Id.* at 23-25, ¶¶ 104-105, 109-112. Because Allergan makes Restasis, the only FDA-approved drug to treat chronic dry eye syndrome, Valeant's intended acquisition of Allergan would have put it in direct competition with products using MIM-D3. *Id.* In light of this conflict of interest, MPI alleges that B+L and Valeant breached the Agreement in bad faith in order to damage MPI, injure its reputation, and delay the development of MIM-D3. *Id.*

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss under Rule 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a motion under Rule 12(b)(6), a court ordinarily may not rely on matters outside the pleadings unless the court treats the motion as one for summary judgment under Rule 56 and gives the parties a reasonable opportunity to present relevant evidence.  Fed. R. Civ. P. 12(d).  However, as the Second Circuit explained in *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002):

> For purposes of this rule, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991)); *see* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. *Int'l Audiotext*, 62 F.3d at 72.

*Id.* at 152-53 (2d Cir. 2002).  With respect to documents that are deemed "integral" to the complaint, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  Furthermore, "where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Chambers*, 282 F.3d at 153 (quoting *Cortec*, 949 F.2d at 48) (internal quotations omitted).

Here, B+L and Valeant attached a copy of the FDA Meeting Minutes and a redacted copy of the Agreement to the reply brief in support of their motion to dismiss.  ECF No. 23.  MPI's answer, which includes its claims against B+L and Valeant, is replete with quotes from and references to both the Agreement and the FDA Meeting Minutes.  *See* ECF No. 6.  MPI does not contest the authenticity, accuracy, or relevance of these documents.  MPI's claims against B+L and Valeant are for breach of contract and various torts related to the alleged breach of contract, all of which depend on the terms and effect of the Agreement and the FDA Meeting Minutes.  *Id.* Both the FDA Meeting Minutes and the redacted copy of the Agreement are therefore considered incorporated by reference and integral to MPI's answer, and the Court will consider these documents in the context of the instant motion to dismiss.  *Chambers*, 282 F.3d at 153.

## DISCUSSION

In its answer, MPI asserts the following four claims: (1) breach of contract against B+L; (2) "intentional breach of contract" against B+L; (3) tortious interference with contract against Valeant; and (4) violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, §11, against Valeant.  *See* ECF No. 6, at 22-27.  Before turning to the merits of the motion

to dismiss filed by B+L and Valeant, the Court will first address the threshold question of what law applies to MPI's claims.

### 1.  Choice of Law

As a federal court exercising its diversity jurisdiction in the State of New York, the Court must apply New York's choice-of-law rules to determine what law applies.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001).  The law of the forum, in this case New York, also dictates the validity and scope of a contractual choice-of-law clause.  *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332-33 (2d Cir. 2005).  Here, § 13.11 of the Agreement between MPI and B+L reads:

> 13.11 <u>Governing Law and Forum</u>.  This Agreement and all claims related to it, its execution or the performance of the parties under it, shall be construed and governed in all respects according to the laws of the State of New York.

The parties in this case do not dispute the validity of § 13.11 or its application to MPI's breach of contract claim against B+L.  That leaves the Court with two open questions: whether § 13.11 applies to MPI's claims against Valeant, who was not a party to the Agreement, and whether § 13.11 applies to MPI's tort claims as well as its contract claim.  Because the Court answers both questions in the affirmative, New York law governs all of MPI's claims in this case.

### a)  Claims Against Valeant

Under New York law, the general rule is that "only parties in privity of contract may enforce terms of the contract."  *Freeford Ltd. v. Pendleton*, 857 N.Y.S.2d 62, 67 (1st Dep't 2008).  However, this rule is subject to an important and relevant exception.

The issue of whether terms of a contract may be enforced by or against a non-signatory to the contract has commonly arisen in the context of motions to compel (or stay) arbitration.  Because the interpretation and enforcement of arbitration clauses is "a matter of contract,

grounded in the agreement of the parties," non-signatories are generally not subject to arbitration agreements notwithstanding the public policy favoring arbitration. *Belzberg v. Verus Investments Holdings Inc.*, 21 N.Y.3d 626, 630 (2013) (internal citations and quotations omitted). However, drawing on federal case law regarding the Federal Arbitration Act, New York courts have applied arbitration clauses to non-signatories via the "direct benefits theory of estoppel." *Id.* "Under the direct benefits theory of estoppel, a non-signatory may be compelled to arbitrate where the non-signatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." *Id.* at 631.

Importantly, this theory has also been applied to choice-of-law provisions. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004); *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, --- F. Supp. 3d ----, No. 12-CV-3463 AJN, 2015 WL 5915958, at *5 (S.D.N.Y. Oct. 8, 2015); *FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*, 754 F. Supp. 2d 628, 636 (S.D.N.Y. 2010).

In *Motorola*, non-signatories to a series of agreements between Motorola and Turkish telecom companies attempted to force Motorola into arbitration under the agreements, which contained both arbitration clauses and Swiss choice-of-law clauses. *Motorola*, 388 F.3d at 50-51. The Second Circuit rejected the non-signatories' argument that the Swiss choice-of-law clause did not apply, reasoning that if the non-signatories "wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements." *Id.*

*FR8 Singapore* involved a contract between FR8 Singapore Pte. Ltd. ("FR8") and Albacore Maritime Inc. *FR8 Singapore*, 754 F. Supp. 2d at 628-29. The contract included both an arbitration clause and a choice-of-law clause. *Id.* at 629. FR8 sought to compel three non-signatory corporations to arbitrate under the agreement, but argued that federal common law

(rather than English law, which was specified in the contract's choice-of-law clause) should govern the analysis. *Id.* at 633. The court in *FR8 Singapore* held that the choice-of-law clause applied, rejecting FR8's attempt to "avoid the choice-of-law clause in the very agreement it seeks to enforce." *Id.* at 636.

In *International Chartering*, non-signatory plaintiffs sought a declaratory judgment that defendants were liable for payments and damages under certain brokerage contracts that the defendants had entered into. *Int'l Chartering Servs., Inc.*, 2015 WL 5915958, at *1. Defendants filed a motion to compel arbitration, invoking the arbitration and choice-of-law provisions in the brokerage contracts. *Id.* at *2. Because plaintiffs were seeking "a benefit that depends on the [contracts] for its existence," the court held that plaintiffs were estopped from denying the choice-of-law provisions in those contracts. *Id.* at *3-6.

Here, the Agreement at issue was signed by MPI and B+L. MPI has asserted claims against Valeant, a non-signatory, for tortious interference with contract and violation of the Massachusetts Consumer Protection Act. ECF No. 6. All of MPI's claims arise out of B+L's failure to pay the $20 million fee when B+L decided to not exercise the Option, which MPI contends was a breach of the Agreement. *Id.* Despite its direct reliance on the Agreement, MPI argues that the Agreement's New York choice-of-law provision does not apply to its claims against Valeant because Valeant was not a party to the Agreement. ECF No. 22, at 25. However, the posture of this case mirrors that of *FR8 Singapore* and compels the same result. MPI is estopped from avoiding the choice-of-law provision in the very Agreement it not only signed, but also directly relies on for its claims against both B+L and Valeant. *FR8 Singapore*, 754 F. Supp. 2d at 636; *see also Belzberg*, 21 N.Y.3d at 630-31; *Int'l Chartering Servs., Inc.*, 2015 WL 5915958, at *5; *Motorola*, 388 F.3d at 51.

### b) Tort Claims

The second open question regarding the scope of § 13.11 is whether it applies to MPI's tort claims as well as its contract claim. The Court finds that it does.

New York courts are reluctant to read contractual choice-of-law provisions more broadly than they are actually written. *See Finance One*, 414 F.3d at 334 (citing *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 427 N.Y.S.2d 10, 12-13 (1980)). Thus, language in a choice-of-law provision indicating that the *contract* will be governed by a certain body of law is insufficient to determine which law will govern *tort claims arising out of* that contract. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). In order for a choice-of-law clause to cover extra-contractual claims, "the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Id.* (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994)).

For example, in *Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*, 840 N.Y.S.2d 16, 23 (1st Dep't 2007), the contracts at issue "broadly state[d] that Delaware Law governs 'all issues' concerning 'enforcement of the rights and duties of the parties.'" The Appellate Division held that Delaware law governed plaintiffs' tort claims because such claims "fall squarely within the broad terminology used in the choice of law provisions." *Id.*

Here, § 13.11 of the Agreement between MPI and B+L states that "[t]his Agreement and all claims related to it, its execution or the performance of the parties under it, shall be construed and governed in all respects according to the laws of the State of New York." Like in *Capital Z*, the choice-of-law clause in this case is sufficiently broad to encompass MPI's tort claims. All of MPI's claims arise out of B+L's failure to pay the $20 million fee when B+L decided to not exercise the Option, which MPI contends was a breach of the Agreement. These claims are undoubtedly "related to" the Agreement, and therefore fall within the broad language of § 13.11.

Indeed, the language used in § 13.11 is precisely the kind of language previous courts have suggested should be used in order to ensure the broadest application of a choice-of-law provision. *See Frazer Exton Dev., LP v. Kemper Envtl., Ltd.*, No. 03 CIV. 0637 (HB), 2004 WL 1752580, at *10 (S.D.N.Y. July 29, 2004), *aff'd sub nom.* 153 F. App'x 31 (2d Cir. 2005) ("In order to achieve broad coverage, parties utilize choice of law provisions that employ expansive language such as 'arising out of or relating to' the contract.") (quoting *Turtur*, 26 F.3d at 310).

Based on the foregoing analysis, the Court finds that § 13.11 of the Agreement applies to all of MPI's claims in this case.  Accordingly, the Court will apply New York law.[2]

## 2.  Motion to Dismiss

The motion to dismiss filed by B+L and Valeant contains four arguments.  First, B+L and Valeant argue that the Agreement's limitation of liability provision precludes MPI's demand for recovery of lost profits, consequential damages, and loss of enterprise value.  ECF No. 17-1, at 7-10.  Second, B+L argues that MPI's "intentional breach of contract" claim is invalid because New York law does not recognize such a claim.  *Id.* at 10-12.  Third, Valeant argues that MPI fails to state a claim for tortious interference with contract against Valeant because Valeant, as the parent corporation of B+L, had an economic interest in the Agreement.  *Id.* at 12-17.  Fourth, Valeant argues that MPI's claim under the Massachusetts Consumer Protection Act fails because New York law applies.  *Id.* at 17-19.  These arguments are addressed in turn.

### a)  Limitation of Liability

For each of MPI's first three claims (breach of contract against B+L, intentional breach of contract against B+L, and tortious interference with contract against Valeant), MPI alleges

---

[2]     In general, New York law gives full effect to choice-of-law provisions so long as enforcement of the provision does not violate any fundamental New York public policy and the chosen jurisdiction has a substantial relationship to the parties or their performance. *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381 (1957)).  The parties in this case do not argue that applying § 13.11 of the Agreement would violate any New York public policy or that New York lacks a sufficient relationship to this case.

that it suffered "lost profits, consequential damages, and loss of its enterprise value." ECF No. 6.

B+L and Valeant argue that these damages are precluded by § 9 of the Agreement, which reads:

> 9.   Limitation of Liability.   NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER MP[I] NOR B+L, NOR THEIR RESPECTIVE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS, SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES SUCH AS LOSS OF OPPORTUNITY, USE, REVENUE OR PROFIT, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EVEN IF SUCH DAMAGES WERE FORESEEABLE, EXCEPT TO THE EXTENT SUCH DAMAGES ARE OWED TO A THIRD PARTY BY A PARTY ENTITLED TO INDEMNIFICATION UNDER SECTION 8 AND EXCEPT FOR ANY DAMAGES ARISING FROM BREACH OF A PARTY'S CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT.

MPI's demand for recovery of "lost profits, consequential damages, and loss of its enterprise value" falls squarely within this provision.  Under New York law, parties to a contract are generally free to absolve themselves from damages caused by negligence or limit liability to a nominal sum. *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 682-83 (2012).

However, New York public policy renders a limitation of liability clause unenforceable when it would bar damages caused by "willful or grossly negligent acts." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983).  Gross negligence, in this context, means conduct that "smacks of intentional wrongdoing" and "betokens a reckless indifference to the rights of others." *Id.*

In *Abacus*, the plaintiff bank hired the defendants to provide alarm and security services. *Abacus*, 18 N.Y.3d at 681.  Although the defendants had knowledge for some time that the alarm equipment had been malfunctioning, they failed to notify anyone at the bank about the potential security breach. *Id.* at 683.  The defendants invoked exculpatory clauses in the relevant contracts as a defense to plaintiff's claims. *Id.* at 682.  The New York Court of Appeals rejected this argument because plaintiffs sufficiently alleged conduct that, if proven, would constitute gross negligence and render the exculpatory clauses unenforceable. *Id.* at 683-84.

Here, MPI alleges that B+L and Valeant knew for certain that the results of the Initial Phase III Trial were Inconclusive rather than Not Successful.  ECF No. 6, at 17 ¶70.  Under the Agreement, this meant that B+L would be obligated to pay $20 million if it decided to not exercise the Option.  Agreement § 5.5(c).  According to MPI, "[i]t was contemplated by the parties that MPI would suffer damages in the form of loss of some or all of the value of its enterprise if B+L walked away from the Agreement after release of the Initial Phase III Trial results."  ECF No. 6, at 11 ¶39.  However, in light of Valeant's intended acquisition of Allergan, MPI alleges that B+L and Valeant decided to injure MPI and stall the development of MIM-D3. *Id.* at 23-25, ¶¶ 104-105, 109-112.  To serve this goal, MPI alleges that B+L and Valeant decided to not exercise the Option, refuse to pay the $20 million fee, and falsely contend that the Initial Phase III Trial was "Not Successful."  *Id.*  These allegations, if proven, would constitute the type of gross negligence and bad faith that "smacks of intentional wrongdoing" and evinces a "reckless indifference" to MPI's rights under the Agreement.  *Kalisch-Jarcho*, 58 N.Y.2d at 385.

B+L and Valeant argue that the decision to not exercise the Option was simply an economically motivated one, and that their position regarding the Initial Phase III Trial results was made in good faith.  ECF No. 17-1, at 7-10.  B+L and Valeant also point out that B+L initially offered to help find a collaborator to continue the development of MIM-D3, and argue that this undercuts MPI's allegations of bad faith conduct.  *Id.*  Of course, the version of events offered by B+L and Valeant may prove to be true.  But the question at this stage of the litigation is whether MPI has plausibly alleged facts which, if proven, would constitute gross negligence. *See Iqbal*, 556 U.S. at 678.  The Court finds that it has.  Accordingly, B+L and Valeant's motion to dismiss MPI's demands for extra-contractual damages is denied.

**b)  Intentional Breach of Contract Claim Against B+L**

MPI's second claim against B+L is for "intentional breach of contract."  ECF No. 6, at

23-24.  Essentially, MPI is seeking to hold B+L liable in tort for B+L's alleged breach of the

Agreement.[3]

In *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992), the New York Court of

Appeals explained that "a contracting party may be charged with a separate tort liability arising

from a breach of a duty distinct from, or in addition to, the breach of contract."  *Id.* (quoting

*North Shore Bottling Co. v. Schmidt & Sons*, 22 N.Y.2d 171, 179 (1986)).  New York law "has

identified several guideposts for separating tort from contract claims."  *Id.*  Specifically, in

attempting to identify an extra-contractual duty, New York courts have considered the type of

relationship between the parties as well as the manner in which the injury occurred and the

resulting harm.  *Id.* at 551-52.  With respect to circumstances in which New York law has

imposed an extra-contractual duty, "it is policy, not the parties' contract, that gives rise to a duty

of due care."  *Id.* at 552.

Here, nothing about the facts alleged by MPI, such as the type of relationship between

B+L and MPI or the manner in which MPI's injury occurred, indicates the existence of a legal

duty independent of or in addition to the duties owed by B+L under the Agreement.  Rather, MPI

simply alleges that "B+L breached the Agreement intentionally and in bad faith" and that B+L

acted with "the purpose of destroying MPI's reputation and enterprise."  ECF No. 6, at 23 ¶104.

MPI cites two cases, *Albemarle Theatre, Inc. v. Bayberry Realty Corp.*, 27 A.D.2d 172

(1st Dep't 1967) and *Schisgall v. Fairchild Pub'ns, Inc.*, 137 N.Y.S.2d 312 (N.Y. Sup. Ct. 1955),

---

[3]         In its motion to dismiss, B+L argued that New York law does not recognize a claim for "intentional breach
of contract."  ECF No. 17-1, at 10-2.  In response, MPI asserts that B+L is "wrong because New York courts
recognize claims of tort liability arising from a breach of contract."  ECF No. 22, at 14.

in support of the proposition that B+L owed MPI an extra-contractual duty.  However, neither of those cases supports the existence of an extra-contractual duty in this case.

In *Albemarle Theatre*, the lessee of a movie theatre allegedly decided to breach its contract with the owner of that theatre in order to damage the value of the owner's property and benefit the lessee's interest in competing theatres.  *Albemarle Theatre*, 27 A.D.2d at 173-74.  The court in *Albemarle Theatre* held that the owner stated a valid tort claim against the lessee, based on the lessee's alleged violation of the "common law duty extraneous to the contract not to act willfully to destroy the property of another."  *Id.* at 177.

In *Schisgall*, the plaintiffs entered into an agreement with the defendant, a publisher, to publish a manuscript that one of the plaintiffs had written about the garment industry.  *Schisgall*, 137 N.Y.S.2d at 315.  Despite receiving orders for the book, the defendant decided to withdraw the book from sale and refuse to publish it or promote it.  *Id.*  The court in *Schisgall* held that plaintiffs stated a claim against the defendant in tort because "[i]t is not the express contractual reservation of rights per se on which the plaintiffs rely, but upon the defendant's breach of the special relationship thus created—plus the defendant's intentional purpose to destroy."  *Id.* at 318.

Unlike *Albemarle Theatre*, which involved the relationship between lessee and property owner, and *Schisgall*, which involved a special arrangement between publisher and author, the Agreement between B+L and MPI did not involve the type of special relationship that would allow for tort liability.  MPI argues that its "property" was destroyed when B+L failed to pay the $20 million exit fee, which B+L and Valeant knew would stall the development of MIM-D3 and damage MPI's business and reputation.  ECF No. 22, at 14-17.  But MPI's logic would improperly extend tort liability to almost every breach of contract case; if a plaintiff could cite a

property interest in its own business in order to establish that the defendant owed an extra-contractual duty, tort liability would be the rule and not the exception in this context.

Absent an extra-contractual duty, MPI fails to state a claim against B+L in tort. *Nahabedian v. Intercloud Sys., Inc.*, No. 15-CV-00669(RA), 2016 WL 155084, at *3 (S.D.N.Y. Jan. 12, 2016). Accordingly, B+L's motion to dismiss is granted with respect to MPI's "intentional breach of contract" claim.

### c) Tortious Interference Claim Against Valeant

MPI's first claim against Valeant is for tortious interference with contract. ECF No. 6, at 24-25.[4] Under New York law, a claim for tortious interference with contract includes the following elements: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the third party to breach the contract without justification; (4) actual breach of the contract; and (5) damages caused by the breach. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).

In its motion to dismiss, Valeant does not argue that MPI has failed to allege any of these elements.[5] Rather, Valeant invokes the "economic interest defense." ECF No. 17-1, at 12-17. The economic interest defense allows a defendant to avoid liability for tortious interference with contract if the defendant "acted to protect its own legal or financial stake in the breaching party's business." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). For example, this defense is available to a parent corporation acting to protect its interest in its subsidiary. *Id.* (citing *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.1988), *cert.*

---

[4]     MPI refers to this claim against Valeant as both "intentional interference with contract" and "tortious interference with contract." *See* ECF No. 22, at 17-22. For the sake of consistency, the Court will use the term "tortious interference with contract" in this decision.

[5]     Indeed, MPI has sufficiently alleged that B+L and MPI entered into a valid contract, that Valeant had knowledge of the contract, that Valeant directed B+L to breach the Agreement without justification, that B+L did breach the Agreement, and that MPI suffered damages as a result. *See* ECF No. 6.

*denied* 488 U.S. 852 (1988)).  Importantly, however, the economic interest defense only applies

if the alleged interferer acted to protect its interest *in the breaching party's business*; an interferer

acting to protect *its own* direct interests, rather than its interest in the breaching party, may not

raise the economic interest defense.  *Dell's Maraschino Cherries Co. v. Shoreline Fruit*

*Growers, Inc.*, 887 F. Supp. 2d 459, 484 (E.D.N.Y. 2012) (noting that the economic interest

defense "only applies when the alleged interfering parties have acted to protect their interest in

the breaching party's business . . . not their own").  "To overcome the economic interest defense,

a plaintiff must demonstrate that the defendant acted with malice or employed fraudulent or

illegal means to procure the breach of contract."  *Armstrong Pump, Inc. v. Hartman*, 745 F.

Supp. 2d 227, 239 (W.D.N.Y. 2010) (citing *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)).

Here, MPI alleges that Valeant decided to injure MPI and stall the development of MIM-

D3 in order to protect its expected interest in Allergan, MPI's competitor.  ECF No. 6, at 23-25.

To that end, Valeant allegedly directed B+L to falsely contend that the Initial Phase III Trial

results were Not Successful and to breach the Agreement by refusing to pay the $20 million exit

fee. *Id.*

In light of these allegations, Valeant may not invoke the economic interest defense to

dismiss MPI's tortious interference claim.  Valeant is correct that as B+L's parent corporation,

Valeant had a financial stake in the Agreement that could potentially absolve it of liability.

*White Plains Coat & Apron*, 8 N.Y.3d at 426.  But at the pleading stage, dismissal on the basis of

the economic interest defense would only be appropriate if it was clear from the face of MPI's

own allegations that Valeant actually did act to protect its interest in B+L. *Armstrong Pump*, 745

F. Supp. 2d at 239 (citing *New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, 07 Civ.

8304, 2009 WL 1515696, at *7 (S.D.N.Y. June 1, 2009)).  On the contrary, MPI alleges that

Valeant's reason for inducing a breach of the Agreement was to protect *its own expected interest in Allergan*, not to protect its interest in B+L.[6]  *Dell's Maraschino*, 887 F. Supp. 2d at 484.

Further, even if the economic interest defense did apply, dismissal would still be inappropriate because MPI has plausibly alleged that Valeant acted with malice towards MPI. In particular, MPI alleges that "Valeant induced B+L to breach the Agreement with the specific intent to cause harm to MPI's MIM-D3 development efforts in order to, among other things, damage a competitor to Allergan's Restasis." ECF No. 6, at 24 ¶109.

Valeant characterizes MPI's allegations of malice as "conclusory," ECF No. 17-1, at 12-17, but that characterization is far from accurate. According to MPI's allegations, "Valeant is a company known for acquiring pharmaceutical companies and slashing research and development expenses post-acquisition." ECF No. 6, at 24 ¶110.[7]  Given Valeant's intended acquisition of Allergan, a competitor to MPI, "there was a specific motive for Valeant to insist that B+L dispense with MIM-D3." *Id.* With respect to the alleged breach of contract at issue in this case, MPI alleges that B+L and Valeant knew for certain that the results of the Initial Phase III Trial were Inconclusive rather than Not Successful. *Id.* at 17 ¶70. MPI alleges that because Valeant wanted to injure MPI and stall the development of MIM-D3, Valeant directed B+L to falsely contend that the Initial Phase III Trial results were Not Successful and to breach the Agreement by refusing to pay the $20 million exit fee. *Id.* at 23-25. MPI alleges that this exit fee was designed to protect MPI in the event that the Initial Phase III Trial results were Inconclusive, and that the parties were aware that "MPI would suffer damages in the form of loss of some or all of

---

[6]    Indeed, if MIM-D3 is able to generate valuable dry eye syndrome products, then Valeant's alleged interference would actually have been *detrimental* to its interest in B+L (which had invested heavily in the development of MIM-D3 by entering into the Agreement).
[7]    This allegation is supported by two further factual allegations. First, MPI alleges that because of Valeant's reputation, B+L felt compelled to assure MPI that it remained committed to the Agreement when Valeant initially announced that it would acquire B+L. ECF No. 6, at 17 ¶73. Second, MPI alleges that Valeant used MPI in a presentation to respond to Allergan's similar concerns about Valeant's reputation for slashing research and development expenses. *Id.* at 18 ¶79.

the value of its enterprise if B+L walked away from the Agreement after release of the Initial Phase III Trial results." *Id.* at 11 ¶39.  Contrary to Valeant's characterization, these factual allegations do allow the Court to draw the reasonable inference that Valeant acted maliciously towards MPI in order to harm MPI's business and prevent the development of a soon-to-be competing product.

Of course, as mentioned above, MPI's allegations may prove to be exaggerated or even unfounded.  But at the pleading stage, the Court's role is simply to analyze the sufficiency of the plaintiff's allegations.  *See, e.g.*, *Twombly*, 550 U.S. at 572.  Because MPI has sufficiently stated a claim for tortious interference with contract against Valeant, Valeant's motion to dismiss that claim must be denied.

### d)  Massachusetts Consumer Protection Act

MPI's second claim against Valeant is for violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, § 11.  ECF No. 6, at 25-26.  However, for the reasons discussed above, MPI is estopped from denying the New York choice-of-law provision in the Agreement it signed and now relies on to assert claims against Valeant.  Because New York law applies, Valeant's motion to dismiss is granted with respect to MPI's claim under the Massachusetts Consumer Protection Act.  *Argus Mgmt. Corp. v. Siemens Corp.*, No. 11 CIV. 1923, 2011 WL 4447040, at *3 (S.D.N.Y. Sept. 23, 2011) ("The New York choice-of-law clause in the Merger Agreement precludes Argus' ch. 93A claim as a matter of law."); *Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 609 (1st Cir. 1993).

### CONCLUSION

For the reasons stated above, the motion to dismiss filed by B+L and Valeant (ECF No. 17) is granted in part and denied in part.  The motion is GRANTED with respect to MPI's "intentional breach of contract" claim against B+L and MPI's Massachusetts Consumer

Protection Act claim against Valeant.   The motion is DENIED with respect to MPI's demands for extra-contractual damages and MPI's tortious interference with contract claim against Valeant.

IT IS SO ORDERED.

Dated: May 5, 2016
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court